Christopher F. BROWN, and Grace Fernandez, individually, and on behalf of all other persons and entities similarly situated, Plaintiff,

v.

VISA U.S.A., INC., Defendant.

No. 87 C 3038.

United States District Court,
N.D. Illinois, E.D.

Sept. 1, 1987.

Frederic F. Brace, Jr., Kenneth H. Hanson, Ellen A. Rubel, Law Offices of Frederic F. Brace, Jr., Chicago, Ill., for plaintiff.

Thomas F. Ryan, Sidley & Austin, Marc E. Raven, Chicago, Ill., Robin E. Neuman, Meryl Macklin, Heller, Ehrman, White & McAuliffe, Stephen V. Bomse, San Francisco, Cal., for defendant.

## ORDER

NORGLE, District Judge.

Plaintiffs, Christopher F. Brown and Grace Fernandez, have brought this proposed class action against Visa U.S.A., Inc. ("Visa") alleging a violation of Section 1 et seq. of the Sherman Act, 15 U.S.C. § 1 et seq. Visa has moved to dismiss the complaint for failure to state a claim. Fed.R. Civ.P. 12(b)(6). Under Rule 12(b)(6) only the facts as alleged in the complaint are considered. These facts are taken as true for purposes of this motion. Moreover, plaintiffs receive the benefit of all reasonable inferences following from their allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

## FACTS

Plaintiffs have filed suit on their own behalf as credit card holders and users, and as representatives of a proposed class of national credit card holders and users in the continental United States. Plaintiffs have sufficiently pleaded a class action. Plaintiff Christopher Brown is a holder and user of Visa and Mastercard credit cards, while plaintiff Grace Fernandez is a holder and user of Visa credit cards. Both named plaintiffs are citizens of Illinois and residents of this judicial district. Defendant, Visa, is a corporation doing business in Illinois with its main office in California. Visa is a leading issuer of bank credit cards in the United States through its licensee banks.

On March 10, 1987 American Express Company announced its new "Optima" non-bank credit card program. The "Optima" would carry a low 13.5% interest rate and a $15.00 annual fee. The holder, however, must have another American Express charge card to qualify for the "Optima" credit card.

On March 11, 1987, C.T. Russell, president of Visa, sent a mailgram to its independently owned licensee banks which issue Visa bank credit cards, requesting these banks to "rethink your position in offering American Express products" and to "voice your displeasure" over the American Express decision "to enter one of your most profitable lines of service." (Exhibit A to Amended Complaint). The letter closed by stating that the bank should "please take whatever steps you think best serves your bank's interest."

Visa also at this time placed an advertisement aimed at banks selling American Express travelers checks urging them to stop selling the checks because this would help a competitor. The advertisement encouraged them to sell Visa travelers checks instead which would promote the issuing bank's own name.

Plaintiffs further allege that the Executive Vice President of First Interstate Ban-

corporation in the March 23, 1987 edition of the *Wall Street Journal* stated that First Interstate was "reevaluating its relationship with American Express." He went on to state that nothing rash was planned but that the Optima card was "without question an intrusion into its business." First Interstate offers American Express Gold Cards and travelers checks.

Plaintiffs attempt to state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1. They allege that Visa's letter and advertisement to the licensee banks, as well as the response by at least one bank, exhibit a combination and conspiracy in restraint of trade by attempting to intimidate American Express from issuing its lower interest rate credit card. Plaintiffs allege that they, as well as the class they represent, national credit card holders, may not be able to obtain the new low interest rate "Optima" card.

Plaintiffs seek an injunction against Visa and its licensee banks barring the adoption and maintenance of any plan to boycott American Express products or to threaten financial harm to American Express if it issues its new "Optima" card.

Defendant, Visa, argues in its motion to dismiss that: 1) the complaint fails to allege a combination or conspiracy in violation of Section 1 of the Sherman Act; 2) plaintiffs have failed to plead an anticompetitive effect; and 3) the plaintiffs lack standing to bring this action against Visa. For the following reasons, defendant's motion to dismiss is granted.

## I. *Combination or Conspiracy under the Sherman Act*

■ Section 1 of the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must allege joint conduct or concerted action; independent action is not proscribed. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–69, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984); *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Under this general framework, a business entity has a right to deal, or refuse to deal, with whomever it likes, as

long as it does so independently. *Monsanto*, 465 U.S. at 761, 104 S.Ct. at 1469. Completing the analysis, independence is not possible where it can be shown that a party refused to deal with a particular entity because of an agreement or conspiracy with another party not to deal.

In this case, Visa sent a letter to its member banks to inform them of the infringement on the banks' own credit card market by American Express and to suggest that they take whatever action was in their best interests. The complaint contains no allegation that an actual conspiracy did exist. In order for a conspiracy to exist at least two parties must agree to act in concert. *Copperweld*, 467 U.S. at 768–69, 104 S.Ct. at 2740. The only allegation in the plaintiffs' complaint of any possible action to be taken by one of the member banks was that First Interstate was reevaluating its relationship with American Express. This simply is not enough to demonstrate that a conspiracy existed.

■ Defendant is correct in stating in its reply brief that a manufacturer is permitted to communicate and even to attempt to persuade its distributors to follow a course of action. As long as the manufacturer does not coerce a distributor's decision, there is no violation merely because a distributor independently chooses to follow the suggestion. *See Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 708 (7th Cir.1984).

In the present case, there is an ongoing relationship among Visa and the member banks as there is among any "manufacturer" and its distributors. Visa has a right to communicate directly about competition in the market in which both Visa and the banks compete. Faced with increased competition from the lower interest rate *non-bank* "Optima" card, the banks themselves have a substantial stake in the "Optima" card entry into the market. Therefore, the banks are entitled to hear Visa's views and suggestions on the possible entry of American Express. Then they, independently, may, as Visa's letter says, "take whatever steps [they] think best serves [their] interest."

■ Plaintiffs are correct in arguing that a conspiracy may be shown from the circumstances surrounding a course of dealing. *Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467, 474 (7th Cir.1980). *See also, Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946). However, plaintiffs in this case have simply stated no facts in their complaint from which a conspiracy may be inferred. One bank has merely stated it would reevaluate its relationship with American Express. This falls far short of "concerted action." *See American Tobacco*, 328 U.S. at 810, 66 S.Ct. at 1139 ("conspirators" must have a unity of purpose or common design and understanding, or a meeting of the minds, in order to sufficiently demonstrate a conspiracy). In fact, the plaintiffs allege no "action" by the banks whatsoever. The complaint does not allege that even one bank has decided not to carry American Express products.

In sum, no reasonable inference can be drawn that economic coercion or an actual agreement between Visa and any bank existed. Plaintiffs have neither pleaded any type of coercion whatsoever by Visa to force the member banks to boycott American Express nor any facts to demonstrate that an actual agreement as to such a boycott existed among Visa and its member banks. Therefore, the complaint is defective because no contract, combination or conspiracy is sufficiently alleged.

## II. *Anticompetitive Effect*

Furthermore, plaintiffs must also plead an anticompetitive effect unless the antitrust violation is *per se* illegal. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.1984). Group boycotts are considered a *per se* violation only if they are used to enforce agreements that are themselves illegal *per se*. *Id.* The complaint in this case fails to suggest that the alleged conspiracy consisted of a price-fixing scheme, a tying arrangement, or a market allocation, which are *per se* violations.

*Id.* Therefore, plaintiffs must allege an anticompetitive effect in their complaint.

■ Plaintiffs have failed to do so. They merely allege that as national credit card holders they may be unable to obtain an "Optima" card. Plaintiffs wish the court to consider that if a sufficient number of banks decide to boycott American Express and if American Express then decides to cancel its "Optima" card because of the banks' boycott, then plaintiffs will be deprived of obtaining an "Optima" card. The fact is that plaintiffs do not allege that even one of these "ifs" actually took place. Allegations as to a hypothetical anticompetitive effect are not enough to sustain this complaint. *See Car Carriers*, 745 F.2d at 1107. Plaintiffs are speculating about the effect of this alleged "conspiracy" on the marketplace. Therefore, the complaint is defective for failure to allege an anticompetitive effect.

## III. *Antitrust Standing*

Antitrust standing is not the equivalent of Article III standing. Injury in fact satisfies the constitution. Antitrust standing requires more. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983); *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1168 (7th Cir. 1978). What "more" antitrust standing requires is a matter of debate among the circuits (*see generally Private Antitrust Standing: A Survey and Analysis of the Law After Associated General*, 61 Wash. U.L.Q. 1069 (1984)) and a matter of interpretation in this Circuit. *See, e.g., Wellwoods Development Co. v. City of Aurora*, 631 F.Supp. 221, 228–31 (N.D.Ill.1986); *In re Wheat Rail Freight Rate Antitrust Litigation*, 579 F.Supp. 510, 512–13 (N.D.Ill. 1983). This Circuit's decisions, however, provide some guidance.

Antitrust standing has at least two components. "First, it is necessary to determine whether the plaintiff has suffered an antitrust injury and second whether the plaintiff is the proper party to bring the action." *Local Beauty Supply, Inc. v.*

*Lamaur, Inc.,* 787 F.2d 1197, 1201 (7th Cir.1986); *In re Industrial Gas Antitrust Litigation (Bichan),* 681 F.2d 514, 515 (7th Cir.1982). An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Local Beauty,* 787 F.2d at 1201 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). The *Brunswick* Court explained that an antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the [antitrust] violation." 429 U.S. at 489, 97 S.Ct. at 697.

The parties in this case argue over whether the standing requirements for antitrust injunctive relief are less stringent than for damage actions. While the standard is less stringent in other jurisdictions, the Seventh Circuit, in *Local Beauty,* explicitly held that a plaintiff seeking equitable relief should be no less representative of the interests of the antitrust victims than those seeking damages. 787 F.2d at 1204. Therefore, plaintiff must demonstrate, in a Section 1 case for injunctive relief, the same antitrust injury, or anticompetitive effect. *Id.*

As discussed previously, the complaint in this case does not adequately allege an actual anticompetitive effect. Any allegation of anticompetitive effect is pure speculation on the part of plaintiffs. Therefore, this element of standing is not satisfied.

Furthermore, the second component of antitrust standing must be discussed: plaintiffs must be proper parties to bring the action. Under this component, a court must consider the directness of the injury suffered by the individual plaintiffs and their remoteness from defendant's alleged anticompetitive conduct. The court concludes that plaintiffs have failed to satisfy this aspect of standing.

In *Associated General,* the Supreme Court analyzed the remoteness aspect of an antitrust plaintiff. The Court began by surveying the various tests employed by the circuits for identifying the too remote antitrust plaintiff. Three tests have become popular: 1) the "target area" test, 2) the "direct injury" test, and 3) the "zone of interest" test. *See Bichan,* 681 F.2d at 516 (explaining the various tests). The Court acknowledged that application of the tests has led to "contradictory and inconsistent results." The Court then recommended, albeit in a footnote, a solution: "[c]ourts should analyze each situation [*e.g.,* the remoteness of a particular antitrust plaintiff] in light of the factors set forth in the text." *Associated General,* 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33.

The *Associated General* Court's suggestion, however, does not resolve the issue of antitrust standing in this Circuit. Although the Court expressed dissatisfaction with the various standing tests, it did not explicitly overrule their application. That omission leaves the circuits free to apply the test they have adopted in conjunction with the factors stated in *Associated General. Associated General's* disappointment with the various standing tests stemmed from the inconsistent and contradictory results from application of the tests. *Id.* While consideration of a stock set of factors in conjunction with existing standing tests would tend to produce more consistent results, the exclusive application of the *Associated General* factors would likely inspire even greater consistency. This Court need not resolve that dilemma, however, because the individual plaintiffs fail to satisfy both criteria: they fail to satisfy the target area test and the factors stated in *Associated General.*

The Seventh Circuit adopted the target area test in *Bichan.*[1] 681 F.2d at 517 (stating without citation, "the parties agree that this circuit has adopted the target area test and that if Bichan is to prevail, he

---

**1.** *Bichan* appeared to apply the target area test to the antitrust injury component of antitrust standing. *E.g., Bichan,* 681 F.2d at 517. Later cases, however, have made clear that the target area test is more properly a part of the remoteness component of antitrust standing analysis. *See Local Beauty,* 787 F.2d at 1201 ("target area test … [is] more appropriate for determining when a plaintiff is too remote to be entitled to recover"); *see also Grip-Pak, Inc. v. Illinois Tool Works, Inc,* 694 F.2d 466, 473–74 (7th Cir. 1982).

must show that he has been a target of the alleged conspiracy"). A subsequent case, however, provided a note of hesitation. *See Repp v. F.E.L. Publications, Ltd.,* 688 F.2d 441, 445 (7th Cir.1982) ("[the court] has not faced the need" to adopt a particular test). Nevertheless, consistent application of the target area test by different panels of the Seventh Circuit suggests Judge Bauer's observation in *Bichan* was correct. *See, e.g., Grip–Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 473–74 (7th Cir.1982); *Repp,* 688 F.2d at 445–47. Further *Local Beauty,* (decided after *Associated General*) suggests the Seventh Circuit will continue to apply the target area test. *Local Beauty,* 787 F.2d at 1201.

*Bichan* directs the focus of the target area test to the nature of the antitrust violation and the plaintiff's relationship to the area of the economy allegedly injured by the antitrust violation. 681 F.2d at 516. The *Repp* court refined the test:

> Under the "target area" test, the key inquiry is to identify, from the perspective of the alleged violator, the persons or entities at whom the challenged business practice was primarily directed and the purpose for which the practice was instituted. Only then can a person or entity be characterized as "secondary" or "remote" to the main line of anticompetitive effects.

688 F.2d at 445.

The essence of plaintiffs' claim in this case is a group boycott of American Express. A group boycott is the banding together of certain market players with the goal of gaining market power at the expense of market *competitors* or potential competitors. *See Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978); *Topps Chewing Gum, Inc. v. Major League Baseball Player's Assn.,* 641 F.Supp. 1179, 1186–87 (S.D.N.Y.1986). Thus, the "target" of a boycott is generally a competitor of the alleged violator. The target area test is not satisfied merely because the individual plaintiffs had *some* relationship with the corporate plaintiffs; the individual plaintiffs themselves must have been targets. In the present case,

plaintiffs were not targets because they were not competitors in the market. *Cf. Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n. 14, 102 S.Ct. 2540, 2548 n. 14, 73 L.Ed.2d 149 (1982). Therefore, plaintiffs are not proper parties under the target area test to bring this suit.

The individual plaintiffs fare no better under the factors identified in *Associated General.* A court must consider whether:

1) the defendant intended to cause harm to the plaintiff;

2) the plaintiff is a consumer or competitor in the relevant mrket;

3) the plaintiff's injury was a direct result of the antitrust violation;

4) the injury alleged is speculative;

5) there is a risk of duplicative recoveries if a particular plaintiff's suit is allowed to proceed; and

6) an award of damages among several plaintiffs will give rise to complex issues of apportionment of damages.

*Associated General,* 459 U.S. at 537–45, 103 S.Ct. at 908–12; *see Exhibitors' Service, Inc. v. American Multi–Cinema, Inc.,* 788 F.2d 574, 576–77 (9th Cir.1986); *Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 882 (Fed.Cir.1985); *In re Wheat Rail Freight Antitrust Litigation,* 579 F.Supp. 510, 512–13 (N.D.Ill. 1983).

In the present case, a reasonable inference from the allegations in the complaint is that the defendant intended to cause harm to the plaintiffs by denying them access to "Optima" credit cards. The court also acknowledges that plaintiffs are consumers in the relevant market. Further, the risk of duplicative recoveries and apportionment of damages are not at issue in this suit for injunctive relief.

This court, however, finds that the alleged injury is pure speculation as stated previously. Finally, the directness of the injuries to the plaintiffs as a result of Visa's alleged antitrust violation is questionable. As the Court in *Associated General* stated: "The existence of an identifiable class of persons whose self-interest

would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." 459 U.S. at 542, 103 S.Ct. at 910–11. Clearly the proper party to bring an action against Visa is American Express itself, a direct competitor of Visa, and the direct target of Visa's alleged antitrust violation. The court concludes that plaintiffs are not proper parties to pursue this antitrust action. Accordingly, Visa's motion to dismiss is granted.

### Conclusion

Plaintiffs have failed to demonstrate that an actual contract, combination or conspiracy existed. Plaintiffs have not sufficiently pleaded an anticompetitive effect. Finally, plaintiffs do not have proper standing to bring this action. Therefore, defendant Visa's motion to dismiss plaintiffs' complaint is granted.

IT IS SO ORDERED.